IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MELVIN LOUIS SIMS, JR.                                                    PLAINTIFF

V.                              NO. 13-5253

OFFICER TIM SHEPARD,
FAYETTEVILLE POLICE DEPARTMENT                            DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil action filed by the Plaintiff, Melvin Louis Sims, Jr., pursuant to 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis.*

The events at issue in this case occurred late at night on September 27, 2013, and the early morning hours of September 28, 2013. Plaintiff was not incarcerated at that time. Specifically, Plaintiff maintains that while he and his cousin were in his vehicle, Defendant, Fayetteville Police Officer Tim Shepard, chased after his vehicle and kicked it and damaged it. Plaintiff was subsequently charged in state court as a result of these events. In his complaint, Plaintiff asks that all charges be dropped and that he receive punitive damages for his pain and suffering. At the hearing before the Court held on November 4, 2014, Plaintiff testified that he had already served his time on the state charges, and was only seeking to recover compensation for the damage done to his vehicle.

Defendants have filed a motion for summary judgment. (Doc. 17). As stated earlier, on November 4, 2014, a hearing was held to allow the Plaintiff to respond to the summary judgment motion by testifying.

-1-

**I.     Background:**

**A.     Plaintiff's Version:**

According to Plaintiff's testimony at the hearing, close to midnight on the night of September 27, 2013, he and his cousin and another individual were standing in front of the Dickson Street Theater and were "throwing signs" with their hands to some people they knew. Defendant Shepard and another officer were standing across the street, in full uniform, with their badges and guns visible, and walked across the street and approached Plaintiff's group, thinking they were throwing gang signs. Plaintiff denied they were throwing gang signs, and explained that they were just "like what's up" signs. Defendant Shepard asked for their identification, and ran their identities through the system.[1] The officers left and approximately one and one-half hours later, at around two or three o'clock in the morning of September 28, 2013, Plaintiff and his cousin left the club and got into Plaintiff's vehicle and began to leave the area.  As they were waiting behind some other cars at a stop light, and as Plaintiff began to drive his vehicle forward, he saw a flash of light. The music was playing loudly in his vehicle, when he then heard a boom. At that point, Plaintiff was in "survival mode" and did not know what the boom was. Plaintiff looked back and saw a police officer, but did not know that it was Defendant Shepard. As Plaintiff continued to move forward slowly, the officer ran by the side of Plaintiff's car on the passenger side, and then jumped into the window of Plaintiff's vehicle on the passenger side and was trying to get the keys out of the car. Plaintiff was scared and just wanted to get to a lighted area where he knew he was safe. Plaintiff pushed the gas pedal and the officer held on until Plaintiff turned at Gregg Street, and the officer fell off of the vehicle. Plaintiff testified that when

---

[1] Plaintiff testified that he knew that at that time, he was driving with a suspended driver's license.

-2-

the officer jumped into his car, he knew the officer wanted him to stop, although he did not know at that time that the officer was Defendant Shepard. Plaintiff admitted that although he knew it was a police officer holding onto the car, he did not stop his vehicle. Instead, he left the area and went to his cousin's house, called his mother and also called the county and said that an officer had jumped into his car.

Plaintiff was subsequently charged in state court with knowingly causing physical injury to a police officer and then fleeing from other police officers when they were trying to apprehend him. At his plea hearing held in state court on May 22, 2014, the Court asked Plaintiff if the charges were accurate as to what occurred, to which Plaintiff responded, "Yes, sir." (Doc. 17-6 at p. 4-5). At the hearing held before the undersigned, Plaintiff stated that he had "done my time for this - I just want my car repaired."

Plaintiff also submitted pictures of his vehicle, which the Court marked collectively as Plaintiff's Exhibit No. 1, and carefully reviewed.

**B.     Defendant's Version:**

Defendant submitted an affidavit dated August 25, 2014, attesting to the following:

> I was on foot patrol with Officer Williamson on Dickson Street in the late hours of September 27 and early morning hours of September 28, 2013.
> This was a Friday night of a home football weekend so there were large crowds and a lot of traffic on Dickson Street. The Fayetteville Police Department regularly patrols Dickson Street during the late hours of Friday and Saturday night to help prevent disorderly conduct, fights, etc. One bar, the Dickson Street Theatre had had frequent problems so we needed to pay attention to that establishment. We were near the Fix bar across the street when we noticed three males loitering in front of the Dickson Street Theatre.
> After we looked at them, they began flashing what appeared to be gang signs at us in a possibly taunting fashion. We walked across the street and asked for their identification. They were Melvin Sims, Leon Rucker, Jr. and Doss. Melvin Sims was very intoxicated, but did not appear to be so dangerous to himself or others as to warrant an arrest for public intoxication. Thus, after a

> short conversation, we left them and walked down Dickson Street on patrol toward West Avenue.
>
> The traffic was very heavy and backed up on Dickson Street from the West Avenue traffic signal. I then notice Melvin Sims driving an older model two door Oldsmobile with Mr. Rucker in the passenger's seat. His car stereo was turned up very loud and was probably a Noise Ordinance violation, but what really concerned me was that Melvin Sims still had to be very intoxicated and almost certainly too intoxicated to be driving, especially in this heavy foot traffic and congested area. Mr. Sims' driving with his intoxicated level created a danger not only to himself and other drivers, but to the many pedestrians.
>
> Ms. Sims'[sic] had been forced to stop in the traffic waiting for the traffic signal to change so I walked to the front right of his car and yelled at him to stop the car. Even though we made eye contact through the windshield, he ignored my command to stop and with the traffic now moving he pulled the car forward almost hitting me.
>
> I evaded the car by moving away from the front and toward the passenger side. His car stereo was very loud and Melvin Sims appeared to be trying to ignore my commands to stop so I kicked his door to try to get his attention. This was successful as he looked at me again, and I again ordered him to stop. I did not intend to cause any damage to his car and because this was an older model car with stronger doors, I do not believe that I caused any real damage, just a loud noise.
>
> Mr. Sims vehicle was crawling forward because of the traffic ahead of him and I was able to walk along beside the car attempting to get him to stop. When he obviously would not voluntarily stop his car, I reached in through the window and tried to remove the car keys from the ignition.
>
> At this point, Melvin Sims accelerated further and began to pull into the oncoming lane on Dickson Street to pass the slow moving traffic in his lane. I could not remove the ignition keys and Melvin Sims would not stop the car and even kept accelerating. My legs were dangling outside the car, and as[sic] I was afraid I might get run over by his rear tires. When Melvin Sims turned harder to the left to pass the vehicles in his lane, I was able to slide out the front passenger window and keep my legs from being run over. Melvin Sims was going about 25 mph but I was able to land on my hands and knees and slid on the pavement until I slowed down enough to regain my footing.
>
> Melvin Sims continued accelerating and driving in the oncoming traffic lane until he turned right on Greg Street and sped away.
>
> My pants had both knees ripped out and my knees were bloody and painful. ... Because I needed medical attention, I did not participate in the later arrest of Melvin Sims. At no time during this incident did I strike or use any physical force against Mr. Sims.

(Doc. 17-1).

Defendant also submitted six photographs of Defendant Shepard's injuries taken after the incident, which reflected torn pants and abrasions on Shepard's knees. (Doc. 17-2)

Defendant submitted the Affidavit of Police Officer Blake Williamson, who was on foot patrol with Defendant Shepard during the incident in question. (Doc. 17-2). His account was very similar to that of Defendant Shepard's. In addition, Officer Williamson stated that he saw no damage to Plaintiff's car door. He further stated that Defendant Shepard appeared stuck partway into Sims' car in a dangerous position, as Sims continued accelerating and pulling into the oncoming traffic lane to pass the slower moving cars in front of him, creating a substantial risk of injury to Defendant Shepard, who fortunately was able to back out of the window without sliding underneath Sims' car. Officer Williamson, Officer Jennings, and Officer Schleiff chased Sims' speeding Oldsmobile up Dickson Street until it turned north on Gregg and got away. (Doc. 17-2).

Defendant also submitted a copy of the Felony Information, which charged Plaintiff in the Circuit Court of Washington County, Arkansas, with battery in the second degree, aggravated assault, and fleeing. (Doc. 17-4). Also submitted was a copy of the Sentencing Order and Plea Hearing, where Plaintiff entered a plea and was sentenced to 72 months, with 48 months suspended. (Doc. 17-6).

**II.    Applicable Standard:**

"Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law." Uhiren v. Bristol-Myers Squibb Co., Inc., 346 F.3d 824, 827 (8th Cir. 2003). "Once a party moving for summary judgment has made a

sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce of El Dorado, Ark. v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.574, 586 (1986). "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Merge v. Boehler, 762 F.2d 621, 625 (8th Cir. 1985).

Plaintiff has sued the Defendant in his individual and official capacities. (Doc. 2)**.**

## III. Discussion:

### A.   Allegations Against Defendant in his Individual Capacity:

The crux of Plaintiff's complaint appears to center around the damage done to his vehicle, which allegedly occurred during the course of Defendant's attempt to conduct a traffic stop.  The Court believes Defendant had the right to make the initial stop.  A traffic stop constitutes a seizure of a vehicle's occupants and must be supported by reasonable suspicion or probable cause. See United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012). Defendant Shepard believed Plaintiff to be "very intoxicated," and although Plaintiff denied having anything to drink, he admitted that he had been in the club for one and one-half hours before he got back into his vehicle at around two or three in the morning.  It is also noteworthy that Plaintiff had a suspended driver's license at that time, and that when he began to leave in his vehicle, his stereo was playing music so loudly that it was "probably a Noise Ordinance

violation." (Affidavit of Defendant Shepard, Doc. 17-1). "Any traffic stop is constitutional, no matter the officer's actual motive, so long as the officer had probable cause to believe that a traffic violation actually occurred." United States v. Long, 320 F.3d 795, 798 (8th Cir. 2003). In addition, the totality of the circumstances in this case support the fact that Defendant's stop was supported by reasonable suspicion that criminal activity may be occurring, based upon the facts recited above. See United States v. Chantharath, 705 F.3d 295, 302 (8th Cir. 2013), cert. denied ___U.S.___, 134 S.Ct. 183 (2013).

Regardless of whether Defendant's initial command to Plaintiff to stop his vehicle was supported by probable cause or reasonable suspicion, the fact that Plaintiff ignored the command justified Defendant's subsequent action to somehow get Plaintiff's attention. While Plaintiff denies he heard Defendant command him to stop the vehicle, he cannot dispute the fact that Defendant made such a command. When Plaintiff refused to obey Defendant's command and then attempted to flee, Defendant had probable cause to arrest Plaintiff for resisting arrest. United States v. Gant, No. 12-61 ADM/TNL, 2012 WL 2060637 at *4 (D. Minn., June 7, 2012)(citing United States v. Blackmon, 662 F.3d 981, 985-86 (8th Cir. 2011)).

The next question for the Court to address is whether Defendant used excessive force when he kicked Plaintiff's vehicle in an attempt to get Plaintiff to stop, and then reached into the passenger side window to try to get the keys from the ignition. "We analyze excessive force claims in the context of seizures under the Fourth Amendment, applying its reasonableness standard." Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009)(citing Henderson v. Munn, 439 F.3d 497, 502 (8th Cir. 2006)). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to

effect it." Brown, 574 F.3d at 496 (quoting from Graham v. Connor, 490 U.S. 386, 396 (1989)). "A threat to an officer's safety can justify the use of force in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee." Brown, 574 F.3d at 497. "[T]he test is whether the amount of force used was objectively reasonable under the particular circumstances." Id., 574 F.3d at 496 (quoting from Henderson, 439 F.3d at 502).

The reasonableness of Defendant's force is evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Brown, 574 F.3d at 496 (quoting from Graham, 490 U.S. at 396). Circumstances relevant to the reasonableness of the officer's conduct include "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Brown, 574 F.3d at 496 (quoting from Graham, 490 U.S. at 396).

The undersigned believes Defendant's kicking the vehicle was reasonable in light of the fact that: Defendant believed Plaintiff was intoxicated when he attempted to stop Plaintiff; Plaintiff was playing his stereo music too loudly; and when Defendant told Plaintiff to stop the vehicle, he failed to do so. At that point, Defendant was justified in reaching into the passenger side window to try to obtain the keys from the ignition, and then, Plaintiff accelerated his car. Taking the facts in the light most favorable to Plaintiff, and judging the situation from the perspective of a reasonable officer on the scene, the Court is of the opinion that excessive force was not used in this case by Defendant Shepard.

In any event, Defendant Shepard would be entitled to qualified immunity, as the facts, construed in the light most favorable to Plaintiff, do not establish a violation of a clearly

established constitutional or statutory right of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 232 (2009); see Risdal v. Nixon, No. 13-2545, 2014 WL 5471985 at *2 (8th Cir. Oct. 30, 2014); Morrow v. Kelley, No. 5:13CV00098-SWW-JTR, 2014 WL 6845552 at *4 (E.D. Ark., Dec. 2, 2014).

### B.     Allegations Against Defendant in his Official Capacity:

As Plaintiff has failed to state an underlying constitutional violation, his official capacity claims necessarily fail." See Jackson b. Buckman, 756 F.3d 1060, 1067 n.3 (8th Cir. 2014). Further, even if Plaintiff had established a constitutional violation, he has not established a basis for holding Defendant liable in his official capacity.  Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, the official capacity claims are treated as claims against the City of Fayetteville, Arkansas. See Murray v. Lene, 595 F.3d 868, 873 (8th Cir. 2010), cert.denied ___U.S.___, 131 S.Ct. 255 (2010). To establish the City of Fayetteville's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted). The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. Seymour v. City of Des Moines, 519 F.3d 790, 800 (8th Cir. 2008). There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. Speer v. City of Wynne, 276 F.3d 980 (8th Cir. 2002); Parrish v. Luckie, 963 F.2d 201, 207 (8th Cir. 1992)("a public entity or supervisory official may be held liable

> under § 1983 even though no government individuals were personally liable."). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability. Szabla v. City of Brooklyn Park, 486 F.3d 385, 389-90 (8th Cir. 2007).

Id. at 817-18.

In Johnson v. Douglas County Medical Dept., 725 F.3d 825 (8th Cir. 2013), the Court outlined the necessary elements for establishing the existence of an unconstitutional custom. It stated:

> To establish a claim for "custom" liability, [Plaintiff] must demonstrate:
>
>> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>> 3) That Plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

Id., 725 F.3d at 828 (citations omitted).

Plaintiff has failed to point to any unconstitutional policy or custom that exists within the City of Fayetteville Police Department, and thus, his claim against Defendant Shepard in his official capacity must fail.

**IV.   Conclusion:**

For the reasons stated, the Court recommends that the summary judgment motion filed by Defendants **(Doc. 17)** be granted and this case be dismissed with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may**

-10-

**result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 16th day of December, 2014.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

**AO72A**
**(Rev. 8/82)**